UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-02580-AH-AYPx | Date | October 27, 2026 |
| Title | *Nicholas Shoemake v. Amazon.com Services LLC et al.* | | |

| | |
|---|---|
| Present: The Honorable | Anne Hwang, United States District Judge |

| | |
|---|---|
| Yolanda Skipper | Not Reported |
| Deputy Clerk | Court Reporter |
| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
| None Present | None Present |

**Proceedings: (IN CHAMBERS) ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 30)**

Before the Court is Amazon.com Services LLC's motion for summary judgment. *See* Dkt. No. 30. The parties filed a joint brief addressing the motion. *Id.* Amazon filed a reply. *See* Dkt. No. 41. This matter is fully briefed, and the Court heard oral argument on October 21, 2026. The Court has considered the parties' papers and the relevant law. For the following reasons, the Court **GRANTS** the motion for summary judgment.

## I. BACKGROUND

On a motion for summary judgment, this Court views the facts in the light most favorable to the plaintiff as the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

As a young child, Nicholas Shoemake was diagnosed with autism spectrum disorder and Asberger's syndrome. *See* Shoemake Decl. ¶ 3, Dkt. No. 39. Those conditions affect his "ability to communicate, process information, interact socially, and adjust to changes in schedules and routines." *Id.* ¶ 4. Mr. Shoemake has "difficulty engaging and relating socially to others," "trouble making eye

contact," "trouble responding to people in conversation," and "often fail[s] to understand facial expressions." *Id.* ¶ 5.

In August 2021, Mr. Shoemake began his employment at Amazon. Marks Decl., Ex. A, Shoemake Dep. 72:5-25, Feb. 11, 2026, Dkt. No. 31-1. His job title was "sortation associate," and Amazon compensated him at a rate of $15.85 per hour. *Id.*; Marks Decl., Ex. C at 032, Dkt. No. 31-3. Mr. Shoemake's department was "1092 DLX5, USA AMZL Logistics – DS Variable." Marks Decl., Ex. C at 032. DLX5 "receives, stores, and processes consumer products ordered on the Amazom.com website," and in "the DLX5 warehouse environment, hundreds of workers work together in close proximity to each other, conveyor belts, and other machinery." Romo Decl. ¶ 4, Dkt. No. 32; *see* Marks Decl., Shoemake Dep. 76:7-21. Mr. Shoemake's responsibilities included sorting products and sliding boxes down a chute towards a conveyor belt. Marks Decl., Shoemake Dep. 121:10-122:12.

Upon hire, Amazon provided Mr. Shoemake with "Amazon's Owner's Manual and Guide to Employment and Leave of Absence (LOA) policies," and employees are required to electronically sign an acknowledgement form stating that they have read and reviewed the policies. Romo Decl. ¶ 5. Mr. Shoemake does not dispute that he "received and acknowledged Amazon's policies, including its Owner's Manual and Equal Employment Opportunity ("EEO") Policy." J.A. Facts (JAF) No. 5, Dkt. No. 30-1. The manual provides that using "[a]busive, vulgar, or harassing language to a supervisor, fellow associate, or vendor" is a "category 2" infraction and "generally result[s] in corrective action." Marks Decl., Ex. D at 397, Dkt. No. 31-4. Testimony established that Mr. Shoemake "understood that using foul language . . . was inappropriate," that such language "could anger someone," and that "if people are angry in close quarters, that could lead to a fight." Marks Decl., Shoemake Dep. 77:12-24.

The manual provides information for "employees with disabilities." Marks Decl., Ex. D at 387. The manual states that "the Company is actively engaged in providing reasonable accommodations that will allow qualified, disabled individuals to perform the essential functions of their job." *Id.* The manual also states that "Amazon is committed to engaging in a robust, good faith interactive dialogue to help identify and implement reasonable accommodation." *Id.* To request an accommodation, employees must call the employee resource center, and "Amazon's Disability and Leave Services" (DLS) team will work with the

employee to determine whether a reasonable accommodation is appropriate. *Id.*; Jimenez Decl. ¶ 5, Dkt. No. 34.

At Mr. Shoemake's previous employment, Mr. Shoemake was provided a "job coach" that was employed by Westview Services Inc. JAF No. 17. Westview is a non-profit service agency that provides employment services for their clients, including providing a job coach. Marks Decl., Ex. L at 268, Dkt. No. 31-12. A job coach helps individuals perform tasks in their employment, including through "role modeling" and "providing reminders to help decrease idleness and improve accuracy." JAF No. 23. Testimony established that when Mr. Shoemake began his employment at Amazon, he "directly coordinated with Westview Services and brought them onto site," and that Mr. Shoemake's managers permitted the coaches to come onsite. Marks Decl., Shoemake Dep. 108:5-15. But Mr. Shoemake did not coordinate that accommodation process through the DSL team. *Id.* 108:14-17. From August 2021 to March 2022, Westview provided over 325 hours of on-site job coaching. JAF No. 22.

In March 2022, Mr. Shoemake "told Westview Services that [he] would rather have the vocational specialist or the job coach communicate with [him] more often in phone calls . . . than showing up to the jobsite." Marks Decl., Shoemake Dep. 139:7-12. And Mr. Shoemake's testimony established that he "did not think [he] needed an accommodation to perform [his] tasks successfully at Amazon once the first job coach stopped showing up." *Id.* 147:13-16. Testimony from an employee at Westview established that "it was Mr. Nicholas Shoemake's choice to end services with Westview in May 2022," and that "Amazon did not have anything to do with . . . Mr. Shoemake's cancellation of the job coach services." Milon Decl., Ex. O, Mazourek Dep. 59:15-21, 60:21-25, Aug. 14, 2026, Dkt. No. 38-15.

On May 31, 2022, Mr. Shoemake notified a manager from Amazon that he was "interested in accommodations and would call ERC," because Mr. Shoemake was "not able to maintain some work area as other AAs, causing safety concern as boxes quickly pile up and fall on the floor." Marks Decl., Shoemake Dep. 149:7-23. Mr. Shoemake testified, however, that he did not think that he was interested in a job coach. *Id.* 150:18-151:7. The manager instructed Mr. Shoemake how to apply for accommodations, and he averred that he "understood how to request the accommodations." *Id.* 151:8-14, 153:21-23.

The parties do not dispute that on July 2, 2022, "a different Area Manager observed Mr. Shoemake standing still, without performing any warehouse tasks, while packages accumulated around him." JAF No. 33. That day, a manager "helped Mr. Shoemake call DLS," but the DLS line was closed. *Id.* Nos. 34, 35; *see* Shoemake Dep. 154:5-24. In light of safety concerns, management advised Mr. Shoemake to go home. JAF No. 36. On July 7, Mr. Shoemake contacted DLS, and DLS approved a leave. *Id.* No. 39. On July 14, 2022, Mr. Shoemake submitted a medical form that stated, among other things, that "having a job coaching for guidance and support as needed may be helpful." *Id.* No. 41. Mr. Shoemake's occupational therapist's testimony suggested that a job coach "would be a nice to have, but not a must have in order for Mr. Shoemake to complete his job." Marks Decl., Ex. Q, Parker Dep. at 161:3-7, Aug. 10, 2026, Dkt. No. 31-17. Mr. Shoemake did not present any restrictions to Amazon stating that an employer would need to excuse him from angry outbursts or cursing. JAF 43.

Mr. Shoemake submitted additional paperwork, and from August 20, 2022, to October 21, 2022, DLS sent multiple emails to Mr. Shoemake and the appropriate personnel regarding his job coach accommodation. JAF No. 51. On October 27, 2022, Amazon "indefinitely" approved Westview job coaches to assist Mr. Shoemake with "social, learning, and processing skills needed" for his job. JAF No. 55. On October 31, Mr. Shoemake resumed work with Westview job coach support. JAF 57. In December, an accommodation consultant from Amazon emailed Mr. Shoemake. The email stated that the accommodation request was approved indefinitely, that his "case with the Accommodation Team is ending soon," that he will need to "[c]onnect with HR if there are any issues that need to be addressed in relation to [his] accommodation," and that the "site will continue to assist [him] on [his] approved accommodation request." Jimenez Decl., Ex. B at 504, Dkt. 34-2. Testimony established that Mr. Shoemake "understood all of the content in that e-mail." Marks Decl., Shoemake Dep. 219:14-16. Mr. Shoemake does not dispute that he did not respond to the consultant's email. JAF No. 61.

The consultant again emailed Mr. Shoemake on December 12 and confirmed that DLS would be closing Mr. Shoemake's accommodation case. *Id.* No. 63. Mr. Shoemake does not dispute that the email "instructed him to contact DLS about future accommodation changes or concerns," that he later testified that "he understood he should contact DLS if he had questions or concerns," and that he did not respond to the email. *Id.* Nos. 64-66.

The California Department of Rehabilitation approved short-term support, so job coaching services for Mr. Shoemake ended on January 31, 2023. Mazourek Dep. 70:3-12, Aug. 14, 2026. To obtain additional coaching services, the client must "meet with the service coordinator and open a case." *Id.* 71:5-12. The regional service coordinate would then send a referral packet to Westview, but in this case, Westview did not receive a referral packet from Mr. Shoemake. *Id.* 71:13-23. Testimony suggested that "Amazon did not have anything to do with Westview's ending or conclusion of Mr. Shoemake's job coaching services in January 2023." *Id.* 70:23-71:1. From November 2022 to January 2023, Westview provided over 240 hours of onsite coaching, and Westview was paid $42.43 per hour of coaching. JAF Nos. 67, 68; Mazourek Dep. 68:7-9.

Around February 2023, Mr. Shoemake spoke to managers at Amazon. The managers inquired where the job coaches were, and Mr. Shoemake stated that he did not know. Milon Decl., Ex. B, Shoemake Dep. 416:21-417:18, Aug. 27, 2026. Mr. Shoemake later testified that he believed that Westview was "going to reassign [him]" to another job coach. *Id.* 418:3-8. But Mr. Shoemake does not dispute that Amazon has no "written HR/DLS record" of Mr. Shoemake contacting HR or DLS to request additional support. JAF No. 73.

On March 20, 2023, Mr. Shoemake "flipped off a co-worker," *id.* No. 75, and Mr. Shoemake's testimony established that he "understood that it is against Amazon's standard of conduct to flip off other Amazon employees." Marks Decl., Shoemake Dep. 257:2-5, Feb. 11, 2026. The co-worker complained, and Jacob Seife, an operations manager, asked Mr. Shoemake to step off the platform. JAF No. 78. Mr. Shoemake refused, and responded, "Why are you always fucking bullying me? You need to get a fucking life. You don't fucking do anything besides police me." Marks Decl., Shoemake Dep. 259:24-260:9. Mr. Shoemake understood that such statements violated Amazon's standard of conduct. *Id.* 260:10-12. Mr. Shoemake argues, however, that several managers, including Jacob Seife and Danny Lazo, called him a "retard" multiple times, and that his behavior was due to that. *See, e.g.*, Pl.'s Resp. JAF No. 87.

A human resources investigator determined that Mr. Shoemake committed a category 2 violation, and Amazon issued him a "Final Written Warning" on March 27, 2023. *Id.* Nos. 89-90. The warning stated that Amazon was "interested in understanding what barriers you think need to be removed, or what improvements can be made which would potentially assist you in improving your performance." Marks Decl., Ex. F at 003, Dkt. No. 31-6. Mr. Shoemake does not dispute that the

form had a section for "associate comments," and that "no comments were entered in the comments section." JAF. No. 92. The warning advised that future instances of profanity may result in termination. *Id.* No. 93. Under Amazon's progressive discipline policy, a Final Written Warning stays active for 90 days and during this period, any further behavioral policy violations of the same type would prompt termination. JAF Nos. 94-95.

An investigation report stated that on April 6, Danny Lazo, a manager, "noticed associate Nicholas Shoemake standing still and staring into space." Marks Decl., Shoemake Dep. 277:22-25. The report further stated that Lazo "approached Shoemake and asked him if he was okay or if he needed additional support." *Id.* 277:25-278:2. The report stated that "Lazo told Shoemake that he expects his line to start progressing if he does not need support from Lazo." *Id.* 278:7-9. Shoemake responded, "I would, but you keep distracting me with your bullshit." *Id.* 278:10-11. Mr. Shoemake testified that he was not standing still or staring into space, and that he "was working more slowly, but that's because [he] was having difficulty -- with – with the workflow of OVs." *Id.* 278:24-279:5. Mr. Shoemake understood that his response to Mr. Lazo violated Amazon's standard of conduct. *Id.* 280:24-281:3.

The investigation report stated that on April 6, 2023, a different manager reminded Mr. Shoemake of the written warning that he received previously. *Id.* 284:13-17. Mr. Shoemake responded that he would not have used vulgar language if "Lazo was not an asshole." *Id.* 284: 21-24, 287:8-10. A human resources investigator, Anzley Holt, determined that Mr. Shoemake committed another category 2 violation and recommended termination. JAF Nos. 105-106; Milon Decl., Ex. H, Tran Dep. 121:10-12, 124:10-12, Feb. 25, 2026, Dkt. No. 38-8. Michelle Tran, a human resources partner, agreed with the recommendation; she knew that Mr. Shoemake had an indefinite job coach accommodation, but she did not know of his disability. Tran Dep. 125:6-10, 114:11-13. On April 17, Julio Romo, the person with the authority to make the final determination as to whether to terminate Mr. Shoemake, reviewed the investigation summary and approved the termination. *Id.* 123:24-124:2; JAF No. 107. Julio Romo was not aware of Mr. Shoemake's disabilities or his accommodation. Milon Decl., Ex. K, Romo Dep. 137:25-138:7, Aug. 26, 2026, Dkt. No. 38-11.

In November 2024, Mr. Shoemake sued Amazon in state court, alleging eight causes of action: (1) "disability discrimination"; (2) "harassment based on disability"; (3) "failure to provide reasonable accommodation"; (4) "failure to

engage in a good faith interactive process"; (5) "FEHA retaliation"; (6) "failure to prevent retaliation, harassment, and discrimination"; (7) "violation of Labor Code § 1102.5"; and (8) "wrongful termination in violation of public policy." *See* Compl. ¶¶ 40-105, Dkt. No. 3-1. Amazon removed the case to federal court based on diversity of citizenship. *See* 28 U.S.C. § 1332.

Amazon moved for summary judgment and argued, among other things, that "Mr. Shoemake's employment ended for a legitimate nondiscriminatory reason: behavioral misconduct." Joint Br. 1, Dkt. No. 30. Amazon contended that "Mr. Shoemake cannot point to any evidence of discriminatory or retaliatory animus supporting his causes," and that "the Sr. HR Business Partner who reviewed and approved Mr. Shoemake's termination was unaware of Mr. Shoemake's disability, accommodation request history, or whether he had raised any workplace concerns." *Id.* Plaintiff argued that "[w]hen Shoemake had an onsite job coach as an accommodation to help him communicate with managers, he thrived and performed well. Without a job coach, Shoemake struggled to communicate, and with no small amount of irony, Amazon disciplined and ultimately terminated him for how he interacted with his managers." He further argues that when he was no longer provided with job coaching support, "Amazon did nothing to look into the matter, discuss the issue with Shoemake, or bring the job coach back." *Id.* at 2-3. He believes that "Amazon thus let an accommodation silently lapse due to violation of its own procedures and then blamed the employee for the breakdown." *Id.* at 3.

## II. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the case, and the substantive law "identif[ies] which facts are material." *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, discovery responses, and affidavits that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To carry its burden of production, the moving party must either: (1) produce evidence negating an essential element of the nonmoving party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving party's case. *Nissan Fire & Marine Ins. Co. v. Fritz Cos*., 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citation modified). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). All justifiable inferences are drawn in the nonmoving party's favor. *Anderson*, 477 U.S. at 255.

Plaintiff brings his first, second, third, fourth, fifth, and sixth causes of action under the California Fair Employment and Housing Act (FEHA). *See* Cal. Gov't Code § 12900; Compl. ¶¶ 41, 49, 58, 66, 74, 82. "California's FEHA makes it an unlawful employment practice to discharge or discriminate against employees in the 'terms, conditions, or privileges of employment' because of a physical or mental disability or medical condition." *Zamora v. Sec. Indus. Specialists, Inc.*, 71 Cal. Rptr. 3d 809, 828 (Ct. App. 2021) (quoting Cal. Gov't Code § 12940(a)). A "mental disability" includes, among other things, "[h]aving any mental or psychological disorder or condition . . . that limits a major life activity." Cal. Gov't Code § 12926(j)(1).

It is unlawful "[f]or an employer . . . to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." *Id.* § 12940(m)(1). It is also unlawful for an employer "to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations." *Id.* § 12940(n). And FEHA provides that it is unlawful for an employer to "discriminate against any person because the person has opposed any practices forbidden under this part." *Id.* § 12940(h). FEHA, however, "does not prohibit an employer from refusing to hire or discharging an employee with a physical or mental disability . . . if the employee, because of a physical or mental disability, is unable to perform the employee's essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger the employee's health or

safety or the health or safety of others even with reasonable accommodations." *Id.* § 12940(a)(1).

Plaintiff brings his seventh cause of action under California Labor Code section 1102.5. *See* Compl. ¶ 90. California Labor Code section 1102.5(a) provides that an employer "shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance." Subsection (b) provides that an employer "shall not retaliate against an employee for disclosing information." And subsection (c) provides that an employer "shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation."

For his eighth cause of action, Plaintiff alleges that Amazon's conduct violated California public policy. *Id.* ¶ 100. "The FEHA's provisions may provide the policy basis for a claim for wrongful termination in violation of public policy." *Zamora*, 285 Cal. Rptr. 3d at 829.

## III. DISCUSSION

### A. Mr. Shoemake's Discrimination Claims

#### 1. *McDonnell Douglas* Framework

California applies the *McDonnell Douglas* burden-shifting framework and other federal employment law principles when interpreting FEHA. *Schechner v. KPIX-TV*, 686 F.3d 1018, 1023 (9th Cir. 2012); *see Guz v. Bechtel Nat. Inc.*, 8 P.3d 1089, 1113 (Cal. 2000) ("Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes."); *Junior v. Sonoma Cnty. Superior Ct.*, No. 24-5320, 2025 WL 3515796, at *1-3 (9th Cir. Dec. 8, 2025). Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) the plaintiff carries the initial burden of establishing a *prima facie* case of discrimination. *Id.* at 802.

The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. *Id.* The burden of persuasion, however, never truly shifts from the plaintiff. *Lawson v. PPG*

*Architectural Finishes, Inc.*, 982 F.3d 752, 759 (9th Cir. 2020). "The defendant's only burden (at step two of the analysis) is that of production; it must merely 'produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.'" *Id.* (alteration in original) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981)). The defendant "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254. The "employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* at 257; *see Lawson*, 982 F.3d at 760.

At step three, "should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. "A plaintiff can prove pretext either (1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 849 (9th Cir. 2004) (citation modified).

### 2. **Direct Evidence of Discrimination**

The *McDonnell Douglas* framework does not apply when the employee presents direct evidence of discrimination. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). "Direct evidence is evidence which proves a fact without inference or presumption." *Trop v. Sony Pictures Ent., Inc.*, 29 Cal. Rptr. 3d 144, 153 (Ct. App. 2005). "Where a plaintiff offers direct evidence of discrimination that is believed by the trier of fact, the defendant can avoid liability only by proving the plaintiff would have been subjected to the same employment decision without reference to the unlawful factor." *Id.* (internal quotation omitted). Direct evidence of intentional discrimination is rare, however, and "such claims must usually be proved circumstantially." *Guz*, 8 P.3d at 1113.

"Derogatory comments made by a decision maker are direct evidence of discriminatory animus and can create an inference of discriminatory motive." *Hittle v. City of Stockton*, 101 F.4th 1000, 1013 (9th Cir. 2024) (citation modified). "On summary judgment, direct evidence of discrimination is that which, if believed, proves the fact of discriminatory animus *without inference or*

*presumption*." *Hittle*, 101 F.4th at 1012-13 (9th Cir. 2024) (emphasis added). "To rise to the level of direct evidence of discrimination, . . . 'isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process.'" *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 723 (7th Cir. 1998) (quoting *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996)).

Mr. Shoemake argues that managers Jacob Seife and Daniel Lazo called him a "retard" multiple times "after Shoemake's job coach stopped coming in January 2023," and that such evidence constitutes direct evidence of discrimination. Joint Br. 24. On this issue, Mr. Shoemake's testimony is internally and logically contradictory. In support of his argument, Mr. Shoemake's testimony suggested that "[b]efore the incident" with Mr. Seife, he overheard Mr. Seife using the "R word" "about" Mr. Shoemake in conversations with other employees, but he "couldn't give [] an exact date." Milon Decl., Shoemake Dep. 128:17-129:7. Plaintiff also testified that he "believe[s] with Lazo," he verbally reported after the incident to human resources that Mr. Lazo had used the "R word" to describe him. Milon Decl., Shoemake Dep. 132:4-134:7. In a different deposition, Mr. Shoemake averred that he overheard multiple managers—including Mr. Seife and Mr. Lazo—using that word because they "knew I had a job coach but they didn't fully understand the diagnosis." Milon Decl., Shoemake Dep. 424: 4-17. Plaintiff averred in a second deposition that he "thinks" he verbally reported to "Michelle Tran," "Ainsley Holt," and "Jasmin" that those managers were using that word. *Id.* 425:19-426:8.

Mr. Shoemake's testimony also established, however, that the conversations he had with "any managers . . . were either positive or neutral responses to [him] mentioning having autism. Milon Decl., Shoemake Dep. 127:12-15, Feb. 11, 2026. He averred that managers "had conversations behind [his] back that were negative," but that he did not directly witness these conversations. *Id.* 127:12-20. Mr. Shoemake testified that he did not "remember the precise sentence." *Id.* 128:7-11. He also testified that he heard Jacob Seife use the "R word" once or twice, but "[n]ot, like – like, using it to describe me." *Id.* 128:14-18. Mr. Shoemake was also asked whether "Mr. Seife ever use[d] vulgar language toward [him]," and Mr. Shoemake responded, "No." Marks Decl., Shoemake Dep. 91:4-8, Feb. 11, 2026. Mr. Shoemake admitted that he never included in his written complaints that Jacob Seife or Danny Lazo used that word. *Id.* 129:7-134:7; 94:6-20. Mr. Shoemake also averred in his first deposition that he recalled "having some conversation with HR about Mr. Lazo using the 'R' Word, but [he didn't]

remember when that was, how long that conversation was, or what was specifically talked about." Milon Decl., Shoemake Dep. 135:16-22. He did not remember the name of the person he talked to, and he did not recall "their race, physical description, or gender." *Id.* 135:23-136:4.

Despite the conflicts in Plaintiff's own testimony, the Court assumes that Plaintiff has raised a genuine dispute that his supervisors used the "R word." Having done so, the Court concludes that Plaintiff has not established that the comments allegedly made by a supervisor constituted discriminatory animus connected to his termination. Plaintiff cites to no evidence that a manager used the word close in time to the incidents that resulted in Plaintiff's termination: (1) using an obscene gesture at a co-worker, (2) cursing at a supervisor, and (3) after a final written warning, using vulgar language towards Mr. Lazo, another supervisor. *See Trop*, 29 Cal. Rptr. 3d at 155. Mr. Shoemake has not established a nexus between the alleged discriminatory remarks by Mr. Seife and the employment termination decision made by Anzley Holt, Michelle Tran, or Julio Romo—individuals that Mr. Shoemake does not allege made such remarks. *See Vasquez v. County of Los Angeles*, 349 F.3d 634, 640-41 (9th Cir. 2003).

Mr. Shoemake's declaration states that he "reported to Amazon supervisors, including Human Resources Managers Michelle Tran and Anzley Holt, that managers and co-workers referred to me using the 'R word,' meaning 'retard' or 'retarded.' However, Amazon never opened an investigation into my reports or took any action in response." Shoemake Decl. ¶ 13. This testimony contradicts Mr. Shoemake's prior deposition testimony in a key way: Mr. Shoemake now specifies in opposition to summary judgment that he told particular human resources managers responsible for the termination decision about the usage of the R word, whereas he testified previously that he did not remember who he talked to, including by reference to gender or ethnicity, or how long the conversation was or what was specifically talked about. On this basis, the statement is insufficient to create a genuine dispute of material fact regarding a connection between the alleged discriminatory remarks and the termination decision, even assuming Tran and Holt's supposed knowledge at an unspecified time of a supervisor's discriminatory remarks is sufficiently causally related to the termination decision. *See Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1008 (9th Cir. 1998); *see also Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 454-55 (2d Cir. 1999); *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 448-49 (6th Cir. 2017). Separately, the statements in the declaration are conclusory; they do not indicate which managers and co-workers used the word, when those people used the word,

or when Mr. Shoemake reported the usage of the word. And Mr. Shoemake has not established the basis for his belief that Amazon did not open an investigation into his reports. These self-serving, uncorroborated, and conclusory statements are insufficient to create a genuine dispute of material fact. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *see also De Luna v. Sunrise Hosp. & Med. Ctr., LLC*, 809 F. App'x 358, 360 (9th Cir. 2020); *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985).

### 3. <u>Disability Discrimination Claim</u>

Because there is no genuine dispute of material fact as to direct evidence of discrimination, the Court next addresses the parties' arguments applying the *McDonnell Douglas* framework. The parties first address Mr. Shoemake's disability discrimination claim. Joint Br. 20. Mr. Shoemake may establish a *prima facie* case of discrimination by demonstrating the following: "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Hittle*, 101 F.4th at 1011-12 (quoting *Fonseca*, 373 F.3d at 847). "A plaintiff may demonstrate an inference of discrimination through comparison to similarly situated individuals, *or* any other circumstances surrounding the adverse employment action [that] give rise to an inference of discrimination." *Id.* at 1012 (alteration in original) (internal quotation omitted). "California courts applying this test in the FEHA context have characterized the fourth element as showing that 'some other circumstance suggests discriminatory motive.'" *Id.* (quoting *Guz*, 8 P.3d at 1113). The burden of establishing a *prima facie* case "is not onerous," *Burdine*, 450 U.S. at 253, and there is only a "low threshold of evidence required to do so," *Villiarimo*, 281 F.3d at 1062.

The Court assumes, without deciding, that Mr. Shoemake has established a *prima facie* case of discrimination. *See Crowe v. Wormuth*, 74 F.4th 1011, 1036 (9th Cir. 2023).

Amazon, however, has articulated sufficient, non-discriminatory reasons for terminating Mr. Shoemake based on his inappropriate workplace conduct in violation of Amazon's Standards of Conduct. *See, e.g.*, *Dumas v. New United Motor Mfg., Inc.*, 305 F. App'x. 445, 448 (9th Cir. Dec. 29, 2008) ("NUMMI proffered a legitimate, non-discriminatory reason for terminating Mr. Dumas—his

violation of company policy requiring written permission for extended leaves of absence"). Mr. Shoemake "flipped off a co-worker," JAF No. 75, and Mr. Shoemake's testimony established that he "understood that it is against Amazon's standard of conduct to flip off other Amazon employees." Marks Decl., Shoemake Dep. 257:2-5, Feb. 11, 2026. Amazon issued him a final written warning and advised that such conduct could result in termination. Mr. Shoemake understood that his response to Lazo violated Amazon's standard of conduct. *Id.* 280:24-281:3. Mr. Shoemake does not dispute that he told Danny Lazo that "you keep distracting me with your bullshit," and that the statement violated Amazon's standard of conduct. *See* JAF No. 97; Shoemake Dep. 278:18-21.

The burden thus shifts to Mr. Shoemake to show pretext. "He may do so (1) directly, by showing that unlawful discrimination more likely than not motivated the employer, and/or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Crowe*, 74 F.4th at 1036 (internal quotation omitted).

Mr. Shoemake first argues that an inadequate or one-sided investigation is evidence of pretext. Joint Br. 27. The Court is not persuaded. He contends that when "Seife and Lazo called Shoemake a 'retard,'" "there is no evidence that Amazon did anything." As discussed previously, there are significant inconsistencies in Mr. Shoemake's own testimony that Mr. Seife or Mr. Lazo directed such a comment at Plaintiff. However, even assuming Mr. Shoemake has sufficiently raised a genuine dispute, neither his deposition testimony nor the testimony in his declaration sets out the timing of when he reported the usage of the "R word." The Court has also previously discussed the absence of reliable evidence that Tran or Holt knew that certain supervisors were using the word. The Court concludes there is no genuine dispute of material fact that a lack of investigation by Tran or Holt demonstrates that the legitimate reason offered by Amazon was not its true reason, but was a pretext for discrimination.

Mr. Shoemake next argues that Amazon did not follow its standard operating procedure to ensure that Mr. Shoemake had a job coach. *See* Milon Decl., Ex. U at 1782, Dkt. No. 38-21. Mr. Shoemake argues that "HR Manager's Tran utter failure to follow Amazon SOPs could have prevented the absence of the job coaches and consequentially Shoemake's later improper interactions with management for which he was fired. In essence, Amazon is again creating and enforcing a double standard—ignoring Tran's failure to monitor and assure the presence of the job

coach, while holding Shoemake strictly responsible for the results of their absence." Joint Br. 27. For a discrimination claim, however, the "issue before [the Court] is whether discrimination was a substantial motivating factor in [Amazon's] decision to terminate plaintiff's employment." *Arnold v. Dignity Health*, 266 Cal. Rptr. 3d 252, 268 (Ct. App. 2020). Evidence that Amazon failed to follow its standard operating procedure might suggest that it failed to provide an accommodation that it was required to, but it does not support a rational inference that discrimination was the true reason for its decision to terminate Plaintiff. *See id.*

The relevant decisionmaker was not even aware of Mr. Shoemake's disability, so there is no genuine dispute of material fact as to whether Amazon's decision to terminate Mr. Shoemake was pretextual. *See Crowe*, 74 F.4th at 1036. Julio Romo had the authority to make the final determination as to whether to terminate Mr. Shoemake. Tran Dep. 123:24-124:3, Feb. 25, 2026. Plaintiff does not dispute that Julio Romo was not aware that Mr. Shoemake had a disability or a job coach accommodation when he made the termination decision. Romo Dep. 137:25-138:4, Aug. 26, 2026. Mr. Romo testified that he would still have agreed to termination if he had known those facts. *Id.* 138:5-7. He also testified that he "reviewed over 100 cases involving substantiated behavioral misconduct within 90 days following a FWW regarding the same type of behavioral misconduct. Among those cases, [he has] consistently approved termination." Romo Decl. ¶ 10.

Mr. Shoemake counters that Amazon is liable under the "cat's paw" doctrine. In *Lin v. Kaiser Foundation Hospitals*, 304 Cal. Rptr. 3d 820 (Ct. App. 2023), the California Court of Appeal determined that under the "cat's paw" doctrine, a "plaintiff need not demonstrate that every individual who participated in the [challenged employment action] shared discriminatory animus in order to defeat a summary judgment motion." *Id.* at 829 (alteration in original) (internal quotation omitted). "[S]howing that a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus." *Id.* (alteration in original) (internal quotation omitted). In *Reeves v. Safeway Stores, Inc.*, 16 Cal. Rptr. 3d 717 (2004), the court further elaborated on the theory of liability:

> A supervisor annoyed by a worker's complaints about sexual harassment might decide to get rid of that worker by, for instance, fabricating a case of misconducting, or exaggerating a minor instance

> of misconduct into one that will lead to dismissal. Another manager, accepting the fabricated case at face value, may decide, entirely without animus, to discharge the plaintiff. It would be absurd to say that the plaintiff in such a case could not prove a causal connection between discriminatory animus and his discharge.

*Id.* at 727. Both cases are distinguishable. In this case, the supervisors with the alleged discriminatory animus, Mr. Seife and Mr. Lazo, did not fabricate a case of misconduct or exaggerate an instance of misconduct into one that would lead to dismissal. Indeed, Mr. Shoemake acknowledges that his conduct violated Amazon's standards of conduct.

While Plaintiff admits that his conduct violated Amazon's standards of conduct, his theory appears to be that if managers had not used the "R word," he in turn would not have violated Amazon's policy forbidding vulgar language and "[w]ith the job coach no longer present onsite, several Amazon managers . . . called Shoemake" the "R word" multiple times. *See, e.g.*, Pl.'s Resp. to JAF No. 105. Plaintiff argues that Mr. Seife's and Mr. Lazo's alleged discriminatory animus should be imputed to Amazon and those that Plaintiff reported the usage of the "R word" to.

Assuming, *arguendo*, that Plaintiff's theory of liability is encompassed by the "cat's paw" doctrine, the Court concludes that Mr. Shoemake has not created a genuine dispute of material fact. The plaintiff cannot prevail under the cat's paw doctrine if the employer conducts an independent investigation of the allegations against an employee, and has "taken care not to rely exclusively on the say-so of the biased subordinate." *EEOC. v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 488 (10th Cir. 2006); *see Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 918 (7th Cir. 2007). California courts look to pertinent federal precedent when applying FEHA. For example, in *Hoglund v. Sierra Nevada Memorial-Miners Hospital*, 321 Cal. Rptr. 3d 448, 467 (Ct. App. 2024), the California Court of Appeal, in explaining the cat's paw doctrine, cited *EEOC*.

In this case, Plaintiff has not established a genuine dispute as to Amazon's liability under the cat's paw doctrine for two separate reasons: (1) Michelle Tran and Anzley Holt conducted an independent investigation, and (2) Julio Romo conducted an independent investigation. After the relevant incidents, Anzley Holt conducted an independent investigation and prepared "investigation reports." Tran Decl., Ex. A, Dkt. No. 33-1, Tran Decl., Ex. B, Dkt. No. 33-2. Anzley Holt was the

"case owner" of that investigation and Michelle Tran was a "case team member." In preparing the investigation reports, Anzley Holt interviewed Mr. Shoemake for each incident, and ultimately recommended termination. "[S]imply asking an employee for his version of events may defeat the inference that an employment decision was [] discriminatory." *EEOC*, 450 F.3d at 488. Once Anzley Holt conducted an independent investigation, that cut off the "causal link" between the alleged discriminatory animus and the adverse employment action. Michelle Tran testified that she reviewed the investigation report and "was involved in ensuring and enforcing that our policies were being adhered by employees and being able to give warnings to help individuals course correct in those behaviors." Milon Decl., Tran Dep. 90:2-7, 103:5-8.

At the hearing on the motion, Mr. Shoemake argued that he verbally reported to Anzley Holt that Mr. Seife bullied him, and the alleged lack of an investigation established a discriminatory animus. *See* Milon Decl., Shoemake Dep. 270:17-25, Feb. 11, 2026. But Mr. Shoemake has not established his personal knowledge for the claim that there was a lack of an investigation, and his conclusory statement within his declaration does not suffice. And the evidence established that Anzley Holt did conduct an investigation. Anzley Holt prepared an investigation report, and concluded that "it was unsubstantiated that Seife was targeting Shoemake nor that Seife violated Amazon policies." Tran Decl., Ex. A at 425.

Julio Romo conducted an independent investigation as well, and that separately cut any causal connection between the alleged discriminatory animus and the adverse employment action. Julio Romo did not conduct a mere "paper review" of Holt's recommendation. *See Brewer*, 479 F.3d at 918. Julio Romo testified that he "reviewed over 100 cases involving substantiated behavioral misconduct within 90 days following a FWW regarding the same type of behavioral misconduct. Among those cases, I have consistently approved termination." Romo Decl. ¶ 10. During his deposition, Romo averred that Amazon followed "the standard process" in disciplining Mr. Shoemake. Milon Decl., Romo Dep. 143:21-144:12. He testified that he would "still agree to termination" if Michelle Tran "had told [him] that Nicholas Shoemake has autism and has an accommodation to have an indefinite job coach." *Id.* 137:25-138:7. Based on the evidence, Amazon is not liable under the cat's paw theory because Julio Romo "determine[ed] that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Marshall v. The Rawlings Co. LLC*, 854 F.3d

368, 380 (6th Cir. 2017) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011)).

Mr. Shoemake also cites *Sargent v. Board of Trustees of California State University*, 276 Cal. Rptr. 3d 1 (Ct. App. 2021), and *DeJung v. Superior Court*, 87 Cal. Rptr. 3d 99 (Ct. App. 2008). But in *Sargent*, the discussion of "cat's paw" liability is within the unpublished portion of the opinion and in any event, the supervisor was part of the decision-making process. Similarly, in *DeJung*, the plaintiff applied to be a full-time commissioner. 87 Cal. Rptr. 3d at 103. The Executive Committee was responsible for the ultimate hiring decision, and Allan Hardcastle was the chair of that committee. *Id.* The court observed that Allan Hardcastle made comments that "they" and "we" were "looking for someone younger." *Id.* at 113. The court concluded that "it would be entirely reasonable for a trier of fact to infer that Hardcastle's discriminatory animus influenced the process." *Id.* *DeJung* is thus distinguishable on its facts; Allan Hardcastle was directly part of the ultimate decision as the presiding judge and the chair of the Executive Committee, and other members of the Executive Committee agreed that they wanted someone younger. In this case, neither Mr. Seife nor Mr. Lazo was part of the decision to terminate Mr. Shoemake.

In summary, Mr. Shoemake has not demonstrated sufficiently a genuine dispute "that an employee with animus tainted the investigation and disciplinary process" leading to his termination. *Gannon v. Potter*, 298 F. App'x 623, 624 (9th Cir. 2008). As discussed, Mr. Shoemake has not shown that Mr. Seife's and Mr. Lazo's alleged disability-related animus bore a sufficient nexus to the events at issue. The evidence, viewed in the light most favorable to Mr. Shoemake, established that Mr. Seife may have used derogatory words about Plaintiff. Mr. Shoemake does not provide evidence that would establish when he overheard those comments. Any disability related animus did not taint the investigation and disciplinary process. The witness reports provided by Mr. Seife and Mr. Lazo also do not indicate any disability-related animus. *See* Tran Decl. ¶ 5, Ex. A at 450-51, Dkt. No. 33-1; Ex. B at 479-81, Dkt. No. 33-2. And the investigation reports prepared by Anzley Holt do not indicate any disability related animus. *See id.* Ex. A at 425, Ex. B at 460. As discussed previously, the final decision maker, Julio Romo, was not aware of Mr. Shoemake's accommodation or his disability. Ultimately, Mr. Shoemake has failed to demonstrate that the alleged disability related animus was a "proximate cause" of the termination. *See Rodriguez v. City of Colton*, 631 F. App'x 474, 475 (9th Cir. 2016); *Marshall*, 854 F.3d at 380.

### B. FEHA Retaliation Claim

The parties next address Mr. Shoemake's FEHA retaliation claim. Joint Br. 28. "Employees may establish a prima facie case of unlawful retaliation by showing that (1) they engaged in activities protected by the FEHA, (2) their employers subsequently took adverse employment action against them, and (3) there was a causal connection between the protected activity and the adverse employment action." *Husman v. Toyota Motor Credit Corp.*, 220 Cal. Rptr. 3d 42, 63 (Ct. App. 2017) (internal quotation omitted). "Like claims for discrimination, retaliation claims are subject to the *McDonnell Douglas* burden-shifting analysis." *Id.*

Mr. Shoemake argues that he raised the missing job coach issue in February 2023 with Amazon. He argues that, weeks later, "Supervisor Seife, who Shoemake had just reported for calling him a 'retard,' started a confrontation that Shoemake characterized as 'bullying.'" Joint Br. 30. He argues that "[t]wo and a half weeks after that, Supervisor Lazo, who Shoemake had also reported for calling him a 'retard,' also started a confrontation with him." *Id.* He contends that "[a] reasonable jury, crediting this sequence, could find that Shoemake's request for accommodation and reporting of harassment caused his termination." *Id.*

The Court concludes that Plaintiff has not established a genuine dispute of material fact as to the retaliation claim. Mr. Shoemake averred that he did not affirmatively ask Amazon to provide him with a job coach. Milon Decl., Shoemake Dep. 420:17-19, Aug. 27, 2026. He stated that he spoke to "Tommy, Jasmin, Dallas, and Moises," that they would ask Mr. Shoemake where the job coach was, and that Mr. Shoemake would respond, "I don't know." *Id.* 417:6-19. Mr. Shoemake also testified, however, that he told the managers that Westview might be assigning Mr. Shoemake a new job coach. *Id.* 418:1-10. For the purposes of this claim, the Court assumes that Mr. Shoemake requested an accommodation, which constitutes protected activity under FEHA. *Miller v. Dep't of Corr. & Rehab.*, 325 Cal. Rptr. 3d 746, 766 (Ct. App. 2024).

The Court concludes, however, that Mr. Shoemake did not sufficiently demonstrate that there was a causal link between the protected activity and his termination. When Mr. Shoemake began his employment, it is undisputed that his managers allowed the job coach to come onsite and provide coaching. JAF No. 20. For the first eight months of his employment, Mr. Shoemake received over 325 hours of on-site job coaching. *Id.* No. 22. In March 2022, Mr. Shoemake told

Westview that he preferred the job coach to offer telephonic coaching rather than accompanying him-on site. Milon Decl., Ex. A, Shoemake Dep. 139:7-12, Feb. 11, 2026. In May 31, 2022, after an area manager observed boxes piled around Mr. Shoemake's work area, Mr. Shoemake notified the manager that he was interested in accommodations. JAF Nos. 28-29. The manager instructed Mr. Shoemake how to request accommodations through Amazon's application. *Id.* No. 30. A month later, an area manager assisted Mr. Shoemake in calling DLS. *Id.* No. 34. DLS approved a leave of absence, and for the next few months, DLS coordinated with Mr. Shoemake to ensure that he submitted the relevant paperwork, even though Mr. Shoemake missed the deadline. *Id.* No. 48. In October, Amazon approved an "indefinite" job coach accommodation, and Mr. Shoemake returned to work. *Id.* No. 55.

The evidence established that Amazon was aware of Mr. Shoemake's need for a job coach as early as August 2021. When Mr. Shoemake told Westview that he no longer wished to have a job coach onsite, Westview no longer provided such job coaching. Subsequently, Mr. Shoemake started to have some work-related issues. Area managers assisted Mr. Shoemake in calling DLS, and DLS coordinated with Mr. Shoemake to obtain a job coach. The evidence thus established that Mr. Shoemake had already requested an accommodation before February 2023, and that Amazon did not show any discriminatory animus for this request. Mr. Shoemake has not established that his alleged request for accommodations was causally linked to the adverse employment actions, given that certain personnel at Amazon were aware of his need in May 2022, but the termination did not occur until a year later. Plaintiff does not otherwise explain how his request for accommodation caused his termination.

Mr. Shoemake also argues that he was terminated because he reported disability harassment. To the extent Plaintiff relies on a "cat's paw theory," Plaintiff does not present sufficient evidence, as discussed previously, establishing when he allegedly reported to Holt or Tran that supervisors used the "R word."

### C. Section 1102.5 Claim

Certain California state courts applied the *McDonnell Douglas* framework to section 1102.5 retaliation claims. *See Lawson*, 982 F.3d at 756. The California legislature, however, enacted section 1102.6, and "thus expressly adopted a burden-shifting evidentiary standard that seemingly replaced the *McDonnell*

*Douglas* test for section 1102.5 retaliation claims." *Id.* at 756-57. Section 1102.6 states the following:

> In a civil action or administrative proceeding brought pursuant to Section 1102.5, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5.

Cal. Lab. Code § 1102.6. Under this standard, "once the plaintiff has carried his initial burden to show that activity protected by section 1102.5 'was a contributing factor in the alleged prohibited action,' the burden of persuasion shifts from the plaintiff to the defendant 'to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by [s]ection 1102.5.'" *Lawson*, 982 F.3d at 759 (alteration in original) (quoting Cal. Lab. Code § 1102.6.). "Section 1102.6 therefore forces the defendant to introduce evidence sufficient to *persuade* the trier of fact that the employment action was indeed lawful." *Id.* "The clear and convincing evidence standard requires an abiding conviction that the truth of the factual contentions at issue is highly probable." *Id.* (citation modified). And unlike *McDonnell Douglas*, "the plaintiff has no burden to show pretext under section 1102.6; once he has made his initial showing, the burden of persuasion stays with the defendant." *Id.*

Some California courts, however, continued to apply the *McDonnell Douglas* test for section 1102.5 claims, and others applied the section 1102.6 evidentiary standard. *See Lawson*, 982 F.3d at 757-58. In *Lawson*, the Ninth Circuit "request[ed] that the Supreme Court of California accepted th[e] certified question" regarding the evidentiary standard applicable to section 1102.5 claims. *Id.* at 760-61. The Supreme Court of California held that the framework prescribed by statute in Labor Code section 1102.6 governs section 1102.5 retaliation claims. *Lawson v. PPG Architectural Finishes, Inc.*, 503 P.3d 659, 660 (Cal. 2022).

Thus, for section 1102.5 claims, the burden is on the plaintiff to establish, by a preponderance of the evidence, that retaliation for an employee's protected activities was a contributing factor in a contested employment action. *Id.* at 667.

"Once the plaintiff has made the required showing, the burden shifts to the employer to demonstrate, by clear and convincing evidence, that it would have taken the action in question for legitimate, independent reasons even had the plaintiff not engaged in protected activity." *Id.* at 667-68. "Under section 1102.6, a plaintiff does not need to show that the employer's nonretaliatory reason was pretextual." *Id.* at 666.

Mr. Shoemake argues that he "told HR Managers Michelle Tran and Ainsley Holt that other supervisors were calling him a disability-based slur—conduct that, if true, violates FEHA's prohibition on harassment because of disability." Joint Br. 31. He cites to his declaration, which states that he "reported to Amazon supervisors, including Human Resources Managers Michelle Tran and Ainsley Holt, that managers and co-workers referred to me using the R word, meaning retard or retarded. However, Amazon never opened an investigation into my reports or took any action in response." Shoemake Decl. ¶ 13. He argues that the "timeline alone between Shoemake's complaints and his termination raises a strong inference of retaliation." Joint Br. 31.

As discussed previously, the evidence offered in support of that argument is insufficient to create a genuine dispute of material fact. His testimony in the declaration is contradictory to his deposition testimony. *See Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d at 1008. Separately, the conclusory statements in the declaration do not create a genuine dispute of material fact. They do not indicate which managers and co-workers used the word, when those people used the word, or when Mr. Shoemake reported the usage of the word. *See Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017) ("Summary judgment is not a time to be coy: '[c]onclusory statements not grounded in specific facts' are not enough." (alteration in original) (quoting *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016))). In any event, Mr. Shoemake does not present sufficient evidence of the timeline upon which he relies for his argument. Accordingly, Mr. Shoemake has not established a genuine dispute of material fact that the alleged report was a contributing factor in the termination.

**D. Failure to Accommodate and to Engage in the Interactive Process**

Under FEHA, an employer is required "to make reasonable accommodation for the known physical or mental disability of an applicant or employee." Cal. Gov't Code § 12940(m)(1). And the employer is required "to engage in a timely, good faith, interactive process with the employee or applicant to determine

effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability." *Id.* § 12940(n). These are separate claims, but "each necessarily implicates the other." *Gelfo v. Lockheed Martin Corp.*, 43 Cal. Rptr. 3d 874, 890 (Ct. App. 2006)

The parties dispute whether Mr. Shoemake has presented evidence that sufficiently put Amazon on notice of whether he suffered a disability covered by FEHA. The Court assumes, *arguendo*, that Mr. Shoemake has done so. But the Court concludes that, viewing the evidence in the light most favorable to Mr. Shoemake, Amazon is entitled to summary judgment on these claims.

Amazon provided Mr. Shoemake with a reasonable accommodation, and Amazon did not fail to engage in a good faith, interactive process to determine reasonable accommodations. Amazon's policy provides that an employee must contact Amazon's DLS team to coordinate an accommodation. Yet, when Mr. Shoemake started working at Amazon, he brought his Westview job coaches with him, and Amazon allowed those job coaches to come onsite and provide coaching. Plaintiff does not dispute that Westview's job coaching notes do not reflect challenges accessing the site or providing services to Mr. Shoemake. JAF No. 21. It is undisputed that for the first eight months of his employment, job coaches provided over 325 hours of on-site job coaching. *Id.* No. 21.

Mr. Shoemake testified that he preferred if the job coaches no longer came with him onsite, and testimony from an employee at Westview suggests that "it was Mr. Nicholas Shoemake's choice to end services with Westview in May 2022," and that "Amazon did not have anything to do with . . . Mr. Shoemake's cancellation of the job coach services." Mazourek Dep. 59:15-21, 60:21-25, Aug. 14, 2026. In that same month, after Mr. Shoemake told an area manager that he was interested in accommodations, the area manager explained how to request accommodations through Amazon's application. JAF No. 30. In July, an area manager helped Mr. Shoemake call DLS. *Id.* No. 34. DLS approved a leave of absence, coordinated with Mr. Shoemake to obtain a job coach accommodation, and accepted Mr. Shoemake's paperwork despite it being untimely. *Id.* No. 48. It is undisputed that Amazon provided Mr. Shoemake with access to more than 500 hours of job coaching in total, and that suggests that Amazon provided a reasonable accommodation. *See Miller v. Santa Clara Cnty. Libr.*, 24 F. App'x 762, 764-65 (9th Cir. 2001).

The California Department of Rehabilitation authorized only three months of Westview job coaching services. In December, before Westview no longer provided the job coaching service, an accommodations consultant from Amazon emailed Mr. Shoemake. The email stated that his "case with the Accommodation Team is ending soon," that he will need to "[c]onnect with HR if there are any issues that need to be addressed in relation to [his] accommodation," that the "site will continue to assist [him] on [his] approved accommodation request," and asked "if there any updates you would like to provide." Jimenez Decl., Ex. B at 504. Mr. Shoemake does not dispute that he did not respond to the email, JAF No. 61, and he testified that if he had any concerns about his job coach, he needed to raise those concerns to HR or DLS. *Id.* No. 66.

In February 2023, when those services ended, Mr. Shoemake brought up the issue of the job coaches with certain managers at Amazon. However, Mr. Shoemake admits that he did not "ask Amazon to provide [him] with a job coach." Milon Decl., Shoemake Dep. 420:17-19, Aug. 27, 2026. Mr. Shoemake told managers at Amazon that he did not know where the job coaches were, but that he "assumed that Westview was going to assign [him] a new job coach." *Id.* 420:11-14. But an employee cannot expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it. *Avila v. Cont'l Airlines, Inc.*, 82 Cal. Rptr. 3d 440, 453 (2008).

In *Hoskins v. BP Prods. N. Am. Inc.*, No. 2:13-CV-0574-SVW-AJW, 2014 WL 116280 (C.D. Cal. Jan. 9, 2014), a district court observed that to establish that an employer failed to reasonably accommodate an employee's disability, the employee must establish that he "is not responsible for any breakdowns in the interactive process." *Id.* at *9. Citing an employment law treatise, the court determined that "[i]f the interactive process breaks down because the employee fails to engage in discussions in good faith, the employee cannot establish a claim for failure to accommodate." *Id.* This Court finds that reasoning persuasive in this case.

And the evidence established that, before that point, whenever Mr. Shoemake affirmatively communicated that he required an accommodation, Amazon assisted Mr. Shoemake in obtaining one. When Mr. Shoemake received a final written warning, the warning stated that Amazon was "interesting in understanding what barriers you think need to be removed, or what improvements can be made which would potentially assist you in improving your performance." Marks Decl., Ex. F at 003, Dkt. No. 31-6. Mr. Shoemake does not dispute that the

form had a section for "associate comments," and that "no comments were entered in the comments section." JAF. No. 92. Between that time and the incident with Mr. Lazo, Mr. Shoemake did not affirmatively communicate to Amazon that he was interested in a job coaching accommodation. The Court concludes that no reasonable jury could find that Amazon did not provide a reasonable accommodation or failed to engage in a good faith, interactive process to determine reasonable accommodations.

At the hearing, counsel for Mr. Shoemake argued that Mr. Shoemake could not affirmatively communicate his need for a job coach, and that required Amazon to do more than it did. The Court is not persuaded for three reasons. First, Amazon is not required to read Mr. Shoemake's mind. Second, the parties do not dispute that Mr. Shoemake was previously able to affirmatively request an accommodation. *See* JAF No. 29. Third, Mr. Shoemake cites to the monthly job coach reports. *See* Marks Decl., Ex. U, Dkt. No. 31-21. The Court has reviewed the reports. The evidence shows that Mr. Shoemake suffered performance issues related to his job duties, but the evidence does not suggest that his communication issues would impact his ability to affirmatively request a job coach. Mr. Shoemake argues that "once Amazon knew Shoemake had an indefinite job-coach accommodation and knew the coaches were gone, it was Amazon's duty to communicate, investigate, extend, replace, and/or reassess the accommodation." Joint Br. 41. Mr. Shoemake does not present any evidence that Amazon agreed to or had ever itself provided the job coach; rather, Amazon provided the indefinite access accommodation, but Mr. Shoemake consistently used outside services to provide the coach. As discussed previously, Amazon also assisted Mr. Shoemake in obtaining access to a job coach. Amazon did ask Mr. Shoemake in December if he had any updates regarding his accommodation case, and instructed Mr. Shoemake to contact DLS or HR if he had any further questions. Mr. Shoemake testified that he did not affirmatively communicate to Amazon that he needed a job coach, and Amazon is not expected to read his mind given that Mr. Shoemake had chosen to stop job coaching beforehand, that Mr. Shoemake did affirmatively request assistance to obtain a job coaching accommodation before—which Amazon assisted in—and that Mr. Shoemake stated that he understood he needed to go directly to HR or DLS if he needed further assistance.

Mr. Shoemake next argues that Amazon failed to provide a reasonable accommodation and engage in the good faith interactive process because "Amazon's own SOP required its HR Manager Tran to coordinate with the job coach, to monitor whether the accommodation was working, and, as the coaching

period neared its end, to determine whether an extension was needed." Joint Br. 42. While Michelle Tran may not have fulfilled certain obligations, the Court concludes, based on the evidence, that there is no genuine dispute of material fact as to whether Amazon otherwise fulfilled the obligations listed in the SOP. Milon Decl., Ex. U, Dkt. No. 38-21. Employees from Amazon allowed Mr. Shoemake to bring his job coaches onsite, assisted him in applying for a job coach accommodation when he notified managers that he was interested in such accommodation, approved the accommodation, and monitored the adequacy of the accommodation. Mr. Shoemake's argument that Amazon is liable because one specific employee did not fulfill certain obligations even though Mr. Shoemake was otherwise reasonably accommodated "unreasonably laud[s] form over substance." *Hanson v. Lucky Stores, Inc.*, 87 Cal. Rptr. 2d 487, 496 (Ct. App. 1999).

### E. Derivative Claims

The parties do not dispute that Mr. Shoemake's remaining claims are derivative of his disability discrimination and retaliation claims. Joint Br. 32-33. Having dismissed those claims as a matter of law, the Court dismisses the derivative claims as well. *Featherstone v. S. Cal. Permanente Med. Grp.*, 217 Cal. Rptr. 3d 258, 272-75 (Ct. App. 2017).

## IV. CONCLUSION

For the foregoing reasons, the motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED.**